Conrad LASKA, Plaintiff-Appellant,

CENTERS FOR MEDICARE AND MEDICAID SERVICES,
Subrogated-Plaintiff,

v.

GENERAL CASUALTY COMPANY of Wisconsin and
Metropolitan Property and Casualty Insurance
Company, Defendants,

PROGRESSIVE NORTHERN INSURANCE COMPANY and
Midwest Security Administrators, Inc.,
Subrogated-Defendants,

UNIVERSITY OF WISCONSIN HOSPITAL AND CLINICS
AUTHORITY, Subrogated-Defendant-Respondent.

Court of Appeals

*No. 2010AP2410. Submitted on briefs December 26, 2012.
—Decided March 14, 2013.*

2013 WI App 42

(Also reported in 830 N.W.2d 252.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Anne MacArthur* and *Rhonda L. Lanford* of *Habush Habush & Rottier, S.C.*, Madison.

On behalf of the subrogated-defendant-respondent, the cause was submitted on the briefs of *Mark Sweet* of *Neuberger, Wakeman, Lorenz, Griggs, & Sweet*, Watertown.

Before Higginbotham, Sherman and Blanchard, JJ.

¶ 1. BLANCHARD, J. Conrad Laska was eligible for health care coverage through the Medicare program when he received treatment for injuries that he suffered in a motor vehicle accident. He was treated at the University of Wisconsin Hospital and Clinics (the "Hospital"). The Hospital, instead of billing Medicare for the treatment, as it indisputably could have done, filed a

357

statutory lien against any tort claims Laska might have and against any settlement or judgment resulting from those claims.

¶ 2. Laska appeals a circuit court judgment that allowed the Hospital to enforce its lien. He argues that the circuit court erred in interpreting federal Medicare law to allow the Hospital to enforce the lien after expiration of the time period within which the Hospital could have billed Medicare for Laska's treatment. He also argues that *Dorr v. Sacred Heart Hospital*, 228 Wis. 2d 425, 597 N.W.2d 462 (Ct. App. 1999), bars enforcement of the lien, and that a recent supreme court case limiting *Dorr*, *Gister v. American Family Mutual Insurance Co.*, 2012 WI 86, 342 Wis. 2d 496, 818 N.W.2d 880, does not change the analysis here. We reject Laska's arguments and affirm the judgment.

## BACKGROUND

¶ 3. Laska sustained his injuries in May 2007. As indicated above, he was eligible for Medicare when treated. The Hospital's charges for Laska's treatment totaled $19,423.26.

¶ 4. Instead of billing Medicare, the Hospital filed a lien under the hospital lien statute, WIS. STAT. § 779.80 (2011–12),[1] which provides, in part, as follows:

> **(1)** Every corporation, association or other organization operating as a charitable institution and maintaining a hospital in this state shall have a lien for services rendered, by way of treatment, care or maintenance, to any person who has sustained personal injuries as a result of the negligence, wrongful act or any tort of any other person.

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

**(2)** Such lien shall attach to any and all rights of action, suits, claims, demands and upon any judgment, award or determination, and upon the proceeds of any settlement which such injured person, or legal representatives[,] might have against any such other person for damages on account of such injuries, for the amount of the reasonable and necessary charges of such hospital.

¶ 5. The lien here provided that the Hospital "claims a lien on any money due or owing, or any claim for compensation damages, award, contributions, settlement or judgment, on behalf of the injured person." For shorthand, we sometimes refer in this opinion to the Hospital's lien as simply a lien against Laska's tort claims.

¶ 6. In September 2008, Laska initiated the action underlying this appeal by bringing tort claims against multiple defendants. He joined the Hospital in the suit because of its lien. The Hospital counterclaimed, seeking a judgment for the value of the lien plus expenses.

¶ 7. The period during which the Hospital could bill Medicare for Laska's treatment expired on December 31, 2008, without the Hospital having submitted a bill to Medicare.

¶ 8. After the expiration of the Medicare billing period, Laska settled his claims in this action with all parties except the Hospital. In June 2009, he executed a release of claims that reserved the question of whether the Hospital could enforce its lien.

¶ 9. Laska moved for summary judgment against the Hospital on the lien issue. He argued that the court should follow the interpretation of federal Medicare law contained in a 2000 U.S. Department of Health and Human Services ("Department") Memorandum.

¶ 10. The 2000 Memorandum focuses on the issue presented here, namely whether providers such as the Hospital may enforce liens after the Medicare billing period has expired. The Memorandum concludes that providers may not enforce liens after that time. The 2000 Memorandum is based on a federal Medicare statute referred to as the "Provider Agreement" Statute, 42 U.S.C. § 1395cc. Under the Provider Agreement Statute, health care providers participating in the Medicare program may "not . . . charge . . . any individual or any other person for . . . services for which such individual is entitled to have payment made under [Medicare]." § 1395cc(a)(1)(A)(i).

¶ 11. In response to Laska's motion for summary judgment, the Hospital contended that the Department's 2000 Memorandum incorrectly interpreted the law, and that federal law did not require the Hospital to withdraw its lien. The Hospital relied, in part, on a separate federal Medicare statute, referred to as the "Secondary Payer" Statute, 42 U.S.C. 1395y(b). The Secondary Payer Statute makes Medicare a secondary payer for medical services provided to a Medicare-eligible patient when "payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan . . . or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance." § 1395y(b)(2)(A)(ii).

¶ 12. The circuit court granted summary judgment to the Hospital. The court rejected the Department's 2000 Memorandum as contrary to the federal Medicare law. The court concluded that federal Medicare law did not require the Hospital to withdraw its lien after the Medicare billing period expired.

¶ 13. In this appeal, Laska renews his argument based on the Department's 2000 Memorandum. In addition, Laska argues that enforcement of the lien is barred by *Dorr*.

¶ 14. Laska's *Dorr*-based argument prompted us to hold this appeal in abeyance pending the supreme court's release of its decision in *Gister*. After the supreme court issued *Gister*, we permitted the parties to file supplemental briefs.

## DISCUSSION

¶ 15. As indicated above, Laska argues (1) that the circuit court erred in interpreting federal Medicare law to allow the Hospital to enforce its lien after the Medicare billing period expired, and (2) that *Dorr* bars enforcement of the lien. These arguments require the application of statutory provisions and other legal standards to undisputed facts, questions of law that we review de novo. *See Butzlaff v. DHFS*, 223 Wis. 2d 673, 679, 590 N.W.2d 9 (Ct. App. 1998).

¶ 16. Before proceeding, we pause to clarify what this appeal is *not* about. First, this appeal is not about whether a liability insurer could have been reasonably expected to pay in Laska's case for purposes of the Secondary Payer Statute. *See* 42 U.S.C. § 1395y(b)(2)(A)(ii) (making Medicare secondary payer when liability insurer "can reasonably be expected" to pay). Laska does not argue that a liability insurer could not have been reasonably expected to pay in this case. In addition, this appeal is not about whether Laska will be made whole for his injuries; Laska has not developed any argument based on the "made-whole" doctrine. Thus, this decision does not

address whether the made-whole doctrine could bar enforcement of a provider lien in another case.[2]

### 1. *Whether Federal Medicare Law Bars Enforcement of the Lien*

¶ 17. We begin with Laska's argument that the circuit court erred in interpreting federal Medicare law, which Laska submits required the Hospital to withdraw the lien after the period to bill Medicare expired. We emphasize that this portion of our discussion addresses only whether *federal* law bars enforcement of the Hospital's lien. The role of state law is addressed below in Section 2.[3]

¶ 18. As he did in the circuit court, Laska bases his argument on the 2000 Department Memorandum. That Memorandum interprets federal law, and in particular the Provider Agreement Statute, as requiring that "providers must drop their liens and terminate all billing efforts to collect from a liability insurer or a beneficiary once the Medicare timely billing period expires, unless[] the liability claim was paid or settled

---

[2] The "made-whole" doctrine is a "rule of priority" relating to subrogation. *See Petta v. ABC Ins. Co.*, 2005 WI 18, ¶ 28, 278 Wis. 2d 251, 692 N.W.2d 639. "[O]nly where an injured party has received an award . . . which pays all of [that party's] elements of damages, including those for which [the party] has already been indemnified by an insurer, is there any occasion for subrogation." *Id.* (quoting *Rimes v. State Farm Mut. Ins. Co.*, 106 Wis. 2d 263, 275, 316 N.W.2d 348 (1982)).

[3] We begin with the federal law issue because the parties brief it first, because the parties' arguments regarding federal law are more clearly developed than their arguments regarding state law, and because, as we explain in ¶¶ 63 and 65 below, *Gister v. American Family Mutual Insurance Co.*, 2012 WI 86, 342 Wis. 2d 496, 818 N.W.2d 880, directs that we analyze federal Medicare law.

prior to the expiration of the Medicare timely filing [i.e., billing] period."[4] Thus, there is no question that the interpretation contained in the 2000 Memorandum supports Laska's position.

¶ 19. As an initial matter, we note that the 2000 Memorandum does not interpret federal Medicare law to bar a lien like the Hospital's any time *before* expiration of the Medicare billing period. Similarly, Laska does not argue that federal law bars the filing of, or requires the withdrawal of, a lien like the Hospital's before the Medicare billing period expires.

¶ 20. For the reasons we explain below, we conclude that Laska fails to persuade us that the Department's 2000 Memorandum is a reasonable interpretation of federal law. We therefore reject Laska's reliance on the 2000 Memorandum.

¶ 21. The following analysis has four parts: a summary of the pertinent federal Medicare statutes and regulations; a discussion of federal case law interpreting the pertinent Medicare statutes; a summary of 1995 and 1996 Department Memoranda that courts have followed; and an explanation as to why Laska fails to persuade us that the 2000 Memorandum is a reasonable interpretation of federal law.

*a. Medicare Statutes and Regulations*

¶ 22. As referenced above, this case involves two federal Medicare statutes, the Provider Agreement Statute and the Secondary Payer Statute. As our discussion will illustrate, the statutes create a tension reflected in federal litigation that is relevant here.

---

[4] There is no dispute that the Hospital is a "provider" for purposes of federal Medicare law.

## Provider Agreement Statute

¶ 23. The Provider Agreement Statute, 42 U.S.C. § 1395cc, in effect establishes rules governing certain activities of providers participating in the Medicare program. Providers must file an agreement with the Department stating that they will comply with the statute's requirements. *See* § 1395cc(a). As relevant here, and as indicated above, the Provider Agreement Statute states that a provider may "not . . . charge . . . any individual or any other person for . . . services for which such individual is entitled to have payment made under [Medicare]." § 1395cc(a)(1)(A)(i).

¶ 24. Thus, the purpose of 42 U.S.C. § 1395cc(a)(1)(A)(i) is manifestly to ensure that neither a Medicare beneficiary nor any other person is charged for services if the beneficiary is "entitled" to have Medicare pay for those services. *See id.*; *see also Rybicki v. Hartley*, 792 F.2d 260, 262 (1st Cir. 1986) (purpose of provision is "protecting the [beneficiary]'s pocketbook"); *McMahon v. Califano*, 476 F. Supp. 978, 981 (D. C. Mass. 1979) (one purpose of Provider Agreement Statute is "to ensure that beneficiaries receive proper . . . financial treatment.").

## Secondary Payer Statute

¶ 25. The Secondary Payer Statute makes Medicare a secondary payer, instead of a primary payer, for medical services provided to a Medicare-eligible patient when "payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan . . . or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance." *See* 42 U.S.C. § 1395y(b)(2)(A)(ii). Thus, automobile and liability insurance policies are designated as "primary plans" for payment, relative to Medicare.

¶ 26. Enacted in 1980, the Secondary Payer Statute was intended to lower the costs of the Medicare program and to shift those costs to responsible third parties, including but not limited to tortfeasors and their liability insurers. *See Oregon Ass'n of Hosps. v. Bowen*, 708 F. Supp. 1135, 1139–40 (D. Or. 1989); *American Hosp. Ass'n v. Sullivan*, Civ. A. No. 88–2027 (RCL), 1990 WL 274639, *9, 1990 U.S. Dist. LEXIS 6306 (D.D.C. May 24, 1990) ("Congress, in an attempt to cut fiscal waste and balance the budget, determined that when a person was eligible for Medicare but there was non-Medicare insurance, it was cheaper to [the Medicare program to] require the provider to first attempt to recover from that insurer, possibly alleviating the need for any Medicare payment."); *see also Joiner v. Medical Ctr. E., Inc.*, 709 So. 2d 1209, 1210 (Ala. 1998) (Congress intended to "shift financial responsibility for a beneficiary's medical treatment from Medicare to the party responsible for the beneficiary's injuries.").[5]

¶ 27. The Secondary Payer Statute further provides that Medicare may make a "conditional" payment to the health care provider, but only if a potential primary payer "has not made or cannot reasonably be expected to make payment with respect to such item or service promptly." *See* 42 U.S.C. § 1395y(b)(2)(B)(i). The final term here, "promptly," is defined by regulation to

_____

[5] In discussing the pertinent Medicare statutes, we rely heavily on *Oregon Association of Hospitals v. Bowen*, 708 F. Supp. 1135 (D. Or. 1989), and *American Hospital Association v. Sullivan*, Civ. A. No. 88–2027 (RCL), 1990 WL 274639, 1990 U.S. Dist. LEXIS 6306 (D.D.C. May 24, 1990). As discussed in more detail below, *Oregon Association of Hospitals* and *American Hospital Association* have proven to be major cases with respect to the interpretation of the federal Medicare statutes pertinent here.

mean "within 120 days after the earlier of the following: (1) The date a claim is filed with an insurer or a lien is filed against a potential liability settlement. (2) The date the service was furnished or, in the case of inpatient hospital services, the date of discharge." 42 C.F.R. § 411.50(b). In addition, the Secondary Payer Statute provides that the Medicare program is entitled to recover from a "primary plan" the conditional payments made by Medicare, if it is demonstrated that that primary payer has responsibility for payment. *See* § 1395y(b)(2)(B)(ii); *see also* 42 C.F.R. Subpart B, §§ 411.20–37 ("Insurance Coverage That Limits Medicare Payment: General Provisions") and Subpart D, §§ 411.50–54 ("Limitations on Medicare Payment for Services Covered Under Liability or No-Fault Insurance").[6]

---

[6] The Secondary Payer Statute, 42 U.S.C. § 1395y(b), provides more fully as follows:

**(2) Medicare secondary payer**

**(A) In general**

Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that—

. . . .

**(ii)** payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan . . . or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

. . . .

**(B) Conditional payment**

**(i)** Authority to make conditional payment

The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be ex-

## Medicare Billing Period

¶ 28. The period within which providers must submit bills to Medicare is set by regulation. Subject to exceptions not relevant here, the general rule is that the provider must bill Medicare within one year of the date of service. 42 C.F.R. § 424.44(a). Here, the billing period expired on December 31, 2008, several months before Laska settled his tort claims.[7]

¶ 29. Before proceeding to the next section of our discussion, we pause to observe that Laska points to nothing on the face of this statutory and regulatory scheme, and we find nothing, that requires a health care provider to withdraw a previously permissible lien when the Medicare billing period expires. Thus, in order for Laska to persuade us that the circuit court erred in interpreting federal law, he must point to some

pected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Repayment required

A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service.

[7] Laska explains that, at the time applicable to his treatment, the regulations were somewhat different, and required the Hospital to bill Medicare by the end of the year following the year of his treatment. However, Laska does not argue that this difference is material to our decision, and we discern no reason why it would be. As already stated, Laska settled his tort claims in June 2009.

authority showing that such a requirement would be a reasonable interpretation of the statutory and regulatory scheme.

### b. Federal Case Law

¶ 30. We turn now to federal case law. Two cases, *Oregon Association of Hospitals* and *American Hospital Association*, are particularly important. Both cases involved litigation over the Department's reliance on the Provider Agreement Statute to attempt to limit the extent to which a provider may pursue payment from a liability insurer in the Medicare context. *See Oregon Ass'n of Hosps.*, 708 F. Supp. at 1136–37; *American Hosp. Ass'n*, 1990 WL 274639 at *1–2, 6–7. In both cases, the court rejected the Department's position that providers are so limited under the Provider Agreement Statute. *See Oregon Ass'n of Hosps.*, 708 F. Supp. at 1141–42; *American Hosp. Ass'n*, 1990 WL 274639 at *9–11.

¶ 31. In order to better explain how the reasoning in *Oregon Association of Hospitals* and *American Hospital Association* applies here, we first highlight a difference between the Secondary Payer Statute as it exists now and as it existed at the time of those cases. As stated above, the Secondary Payer Statute currently provides that Medicare is a secondary payer when "payment has been made or can reasonably be expected to be made" from one of various other listed sources, including liability insurance. *See* 42 U.S.C. § 1395y(b)(2)(A)(ii). In contrast, at the time of *Oregon Association of Hospitals* and *American Hospital Association*, the statute provided that Medicare was a secondary payer when "payment has been made, or can reasonably be expected to be made *promptly*" by one of the other listed sources. *See Oregon Ass'n of Hosps.*, 708 F. Supp. at 1139–40; *American Hosp. Ass'n*, 1990 WL 274639 at *8 (emphasis added). Thus,

368

the statute now omits the word "promptly" in reference to whether Medicare is a secondary payer. In other words, Medicare is a secondary payer under the current statute if another source has paid or can reasonably be expected to pay, while Medicare was a secondary payer under the previous statute only if another source had paid or could reasonably be expected to pay *promptly*.[8] Having highlighted this difference, we turn in more detail to the reasoning in *Oregon Association of Hospitals* and *American Hospital Association*.

¶ 32. In *Oregon Association of Hospitals*, the Department sought to prevent a provider from pursuing a lien against a Medicare-eligible patient's liability insurance to collect more than the provider would have collected in that case if it had billed Medicare. *Oregon Ass'n of Hosps.*, 708 F. Supp. at 1136–37. As indicated above, the Department based its effort to bar the lien on the Provider Agreement Statute, which requires that a provider agree "not to charge . . . any individual or any other person for items or services for which such individual is entitled to have payment made under [Medicare]." *See id.* at 1137 (citing 42 U.S.C. § 1395cc(a)(1)(A)(i)).

¶ 33. In rejecting the Department's position and sustaining the lien, the court sought to harmonize the two major federal statutes at issue here. The court first observed that the Provider Agreement Statute's prohi-

---

[8] To clarify, as explained above, the current Secondary Payer Statute retains the "promptly" period concept for purposes of determining when Medicare may make a conditional payment. *See supra*, ¶ 27 (citing 42 U.S.C. § 1395y(b)(2)(B)(i)) (Medicare may make conditional payment to the health care provider only if a potential primary payer has not made or cannot reasonably be expected to make payment promptly). This "promptly" period is not, however, the focus of our analysis.

bition on charging a Medicare beneficiary or other person does not apply when the beneficiary is not "entitled" to a Medicare payment. *Id.* at 1141. The court then highlighted the term "promptly" in the Secondary Payer Statute version then in effect and concluded that a Medicare beneficiary is not "entitled" to have payment made when a liability insurer is available to pay promptly. *Id.* Therefore, the Department could not limit the provider's recovery regarding a patient not entitled to Medicare coverage. *Id.*

¶ 34. In *American Hospital Association*, the court addressed the Department's promulgation of a regulation that prohibited health care providers from (1) billing liability insurers instead of Medicare and (2) placing liens on the tort claims of Medicare beneficiaries. *See American Hosp. Ass'n*, 1990 WL 274639 at *2, 7. Much as in *Oregon Association of Hospitals*, the Department in *American Hospital Association* defended its regulation by relying, in part, on the Provider Agreement Statute. *See American Hosp. Ass'n*, 1990 WL 274639 at *9. The Department argued that the regulation barring providers from billing liability insurers and filing tort claim liens in this way was a "harmonization" of the Secondary Payer Statute and the Provider Agreement Statute. *Id.* The Department asserted, in part, that allowing a provider such recourse against a patient's tort claims "will directly reduce the amount of the beneficiaries' recovery, and thus is tantamount to billing the individual directly," in violation of the Provider Agreement Statute. *Id.*

¶ 35. The court disagreed with the Department, concluding that the Department's new regulation contravened the Secondary Payer Statute because it "destroyed the congressional scheme by prohibiting providers from looking to a liability insurer, and requiring

Medicare to pay these types of claims which might be paid from a non-governmental source." *Id.* at *8. The court reasoned, in part, that there was no conflict between the Secondary Payer Statute and Provider Agreement Statute, because they could be read together to mean that a Medicare patient is not "entitled" to Medicare benefits until expiration of the "promptly" period then contained in the Secondary Payer Statute. *Id.* at *9. The court permanently enjoined the Secretary from enforcing the regulation in any manner that would "limit the . . . right of . . . providers to recover directly from liability insurers when the liability insurer is a primary payer who will pay promptly." *Id.* at *13.

¶ 36. Thus, under the analysis provided in *Oregon Association of Hospitals* and *American Hospital Association*, when a liability insurer was available to pay "promptly" under the Secondary Payer Statute as it then existed, a Medicare beneficiary was not "entitled" to have services paid by Medicare under the Provider Agreement Statute. Therefore, the Department could not rely on the Provider Agreement Statute to limit a health care provider's recourse against a liability insurer, at least not if that insurer could reasonably be expected to pay "promptly."

¶ 37. As indicated above, subsequent to the *Oregon Association of Hospitals* and *American Hospital Association* cases, Congress amended the Secondary Payer Statute to remove the pertinent reference to "promptly." Under the current version of the Secondary Payer Statute, Medicare is a secondary payer whenever another source can reasonably be expected to pay, regardless whether that source can be reasonably expected to pay "promptly." *See* 42 U.S.C. § 1395y(b)(2)(A)(ii); *cf.* § 1395y(b)(2)(B)(i). The amendment was intended to

clarify that Medicare may be a payer secondary to other sources such as liability insurance even if the primary payer does not or cannot reasonably be expected to pay "promptly." *See* MEDICARE SECONDARY PAYER AMENDMENTS, 71 FED. REG. 9466, 9467 (Feb. 24, 2006). "Congress intended that the [Secondary Payer] provisions be construed to make Medicare a secondary payer to the maximum extent possible." *Id.*

█

¶ 38. If we apply the analysis of *Oregon Association of Hospitals* and *American Hospital Association* to the current Secondary Payer Statute, it logically follows that, when a liability insurer has paid or can be reasonably expected to pay the provider, a Medicare beneficiary is not "entitled" to have services paid by Medicare, as the term "entitled" is used in the Provider Agreement Statute. Continuing with this logic, neither Laska nor the Department could rely on the Provider Agreement Statute to limit a provider's recourse against a liability insurer if it can be reasonably expected that the liability insurer will pay. As we discuss below, this logical extension of *Oregon Association of Hospitals* and *American Hospital Association* informs our analysis of the Department's 2000 Memorandum.

 c. *1995 and 1996 Department Memoranda*

¶ 39. Before proceeding to the Department's 2000 Memorandum that Laska relies on, we first briefly summarize 1995 and 1996 Department Memoranda, because these memoranda and authorities relying on them are relevant to Laska's argument. The 1995 and 1996 Memoranda address a provider's rights to pursue payment from liability insurance instead of Medicare. More specifically, the 1995 Memorandum explained that the following rules apply when a provider "has

372

reason to believe that it provided services to a Medicare beneficiary for which payment under liability insurance may be available":

> - Within the 120 day "promptly" period, [the provider] must bill only the liability insurer, unless it has evidence that the liability insurer will not pay within the 120 day promptly period. If it has such evidence it may bill Medicare for conditional payment, provided it supplies documentation . . . .

> - After the 120 day promptly period has ended, [the provider] may, *but is not required to[,] bill Medicare* for conditional payment if the liability insurance claim is not finally resolved.

>> = *If it chooses to bill Medicare, it must withdraw claims against the liability insurer or a lien placed on the beneficiary's settlement.*

>> = *If it chooses to continue its claim against the liability insurance settlement, it may not also bill Medicare.*

(Emphasis added.) The 1996 Memorandum reaffirmed these rules. In short, the 1995 and 1996 Memoranda interpret federal law to provide a choice for providers: after the "promptly" period has passed, a provider may *either* bill Medicare for conditional payment *or* continue to pursue a "liability insurance settlement," including by means of a lien.

¶ 40. The parties agree that the Department maintains at this time a Secondary Payer "Manual" stating rules similar to those in the 1995 and 1996 Memoranda. They also agree that courts in other jurisdictions have followed the rules in the Manual and the 1995 and 1996 Memoranda. *See Joiner*, 709 So. 2d at 1220–21; *Parkview Hosp., Inc. v. Roese*, 750 N.E.2d 384,

373

390 (Ind. Ct. App. 2001); *Speegle v. Harris Methodist Health Sys.*, 303 S.W.3d 32, 37–38 (Tex. Ct. App. 2009).

¶ 41. As is by now apparent, the rules in the Department's 1995 and 1996 Memoranda do not bar the Hospital from enforcing its lien after the Medicare billing period expires. Rather, as explained above, these rules permit the Hospital to either bill Medicare before the billing period expires and withdraw its lien against Laska's tort claims or to continue to maintain its lien against Laska's tort claims and forego payment from Medicare. This brings us to our analysis of the Department's 2000 Memorandum and Laska's more detailed argument.

### d. The 2000 Memorandum and Laska's Argument

¶ 42. The 2000 Memorandum addresses the 1995 and 1996 Memoranda, stating that the earlier memoranda "do not explain whether providers can continue to use liens . . . to collect from a liability insurer or a beneficiary *once the Medicare [billing] period expires.*" (Emphasis added.) As noted above, the 2000 Memorandum concludes that "providers of services are required to drop their liens and terminate all billing efforts to collect from a liability insurer or a beneficiary once the Medicare [billing] period expires, unless[] the liability claim was paid or settled prior to the expiration of the Medicare [billing] period."

¶ 43. Laska concedes that, under recent federal case law, courts interpreting the federal statutes and regulations at issue here owe no deference to the 2000 Department Memorandum. *See Bradley v. Sebelius*, 621 F.3d 1330, 1338 (11th Cir. 2010) (compiling cases supporting the proposition that agency materials such as guidelines, manuals, and policy statements generally do not have the force of law and do not warrant judicial

deference). In addition, Laska tells us that no court has relied on the 2000 Memorandum.

■

¶ 44. Laska argues, however, that the Department's 2000 Memorandum represents the Department's current policy and is the only authority that addresses the precise question presented here: whether a provider may maintain a lien against a patient's tort claims after the Medicare billing period expires. Laska argues that we should follow the 2000 Memorandum because other courts have uniformly followed the 1995 and 1996 Memoranda, and that it "hardly makes sense" for courts to follow "some but not all" of the Department's memoranda. At least implicit in Laska's argument is also an assertion that the 2000 Memorandum is a reasonable interpretation of the law. In Laska's view, the 2000 Memorandum correctly, or at least reasonably, interprets the law to provide that, once the Medicare billing period has lapsed, "the Hospital's lien ended by operation of law" under the Secondary Payer and Provider Agreement Statutes. We are not persuaded.

¶ 45. We initially note that Laska cites no authority for his suggestion that we are always bound either to follow all or to follow none of the Department's interpretations of federal law in this area. That suggestion is not logical because it fails to account for situations where an agency interpretation is plainly contrary to enacted laws or otherwise unreasonable. *See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). Here, neither the 2000 Memorandum itself nor Laska provides a sufficient

basis to conclude that the 2000 Memorandum is a reasonable interpretation of the law. In fact, all pertinent considerations that we are able to identify are to the contrary.

¶ 46. First, there is an obvious disconnect between the language of the Provider Agreement Statute and the 2000 Memorandum's interpretation of that statute. As we have explained, the 2000 Memorandum purports to rely on the statute's requirement that a provider may not "charge . . . any individual or any other person for items or services for which such individual is entitled to have payment made under [Medicare]." *See* 42 U.S.C. § 1395cc(a)(1)(A)(i). Thus, the 2000 Memorandum apparently deems the Hospital's lien to be a "charge" to Laska or "any other person" for services for which Laska is "entitled" to have payment made by Medicare, *but only after the Medicare billing period expires.* We see nothing in the statutory language to support this interpretation. Indeed, the 2000 Memorandum's interpretation appears to produce the odd result of making a Medicare beneficiary "entitled" to Medicare payment only *after* the Medicare billing period expires. Neither the 2000 Memorandum nor Laska provides any explanation for this oddity or points to any language in any other Medicare statute or regulation that would support such a result.

¶ 47. Second, nothing in the persuasive analysis provided in *Oregon Association of Hospitals* or *American Hospital Association* supports the 2000 Memorandum's interpretation of the Provider Agreement Statute. On the contrary, those cases strongly support a different interpretation. As indicated above, if we apply the reasoning of those cases, Laska is not "entitled" to Medicare payments within the meaning of the Provider Agreement Statute as long as a liability insurer can be reason-

ably expected to pay. This latter interpretation harmonizes the Provider Agreement Statute with the current Secondary Payer Statute, just as *Oregon Association of Hospitals* and *American Hospital Association* harmonize the Provider Agreement Statute with the previous version of the Secondary Payer Statute. As noted above, Laska has not argued that no liability insurer can be reasonably expected to pay in his case.

¶ 48. Third, the 2000 Memorandum undermines the obvious cost-shifting purpose of the Secondary Payer Statute by imposing a cut-off date for provider liens that appears to lack any connection to whether a source other than Medicare can be reasonably expected to pay. If followed, the 2000 Memorandum would encourage providers to pursue Medicare over other sources for payment, except in cases where the provider is certain that underlying legal claims will be resolved before the Medicare billing period expires. As the facts of this case illustrate, the underlying claims may often remain unresolved at the time that the Medicare billing period expires. In addition, following the 2000 Memorandum would provide a perverse incentive to liability insurers to delay settlement until the Medicare billing period expires. We agree with the circuit court's reasoning in this case on these points:

> [T]he 2000 Memorandum's statutory interpretation . . . is clearly contrary to the legislative intent of reducing Medicare's costs because it has a great potential to increase its costs. For instance, in this case, Laska did not settle all of his claims until six months after the Medicare filing deadline passed. Under the 2000 Memorandum, the Hospital would have been required to bill Medicare before the Medicare filing deadline and settlement occurred. Therefore, Medicare would have incurred expenses that it would have avoided . . . . Con-

sequently, the 2000 Memorandum's interpretation would defeat the purpose of reducing Medicare's costs by requiring a provider to bill Medicare before the filing deadline, even when the provider chooses to and is able to pursue payment elsewhere. Further, the policy would encourage non-Medicare insurers to delay settlement until after the Medicare filing deadline in order to shift costs to Medicare.

¶ 49. We recognize that, as discussed above, if a provider bills Medicare and receives a conditional payment, Medicare may be able to recoup at least some of its costs by collecting from the primary payer. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (Medicare program is entitled to recover conditional payments from primary payer if it is shown that the primary payer has responsibility for payment). However, this scenario shifts from providers to Medicare the cost of collection and the risk of any failure to collect. In short, it is apparent that following the 2000 Memorandum would have a tendency to encourage providers to bill Medicare rather than gamble on whether a patient's underlying claims will settle before the Medicare billing period expires.

¶ 50. Laska argues that the Secondary Payer Statute is not intended by Congress to "shift accident-related expenses from the government to liable third parties," but instead only to create "a statutory right of subrogation in favor of the government." However, as we have explained, the cost-shifting purpose as expressed by the plain language of the statute is obvious, and has been consistently recognized by the courts.

¶ 51. In contrast to the 2000 Memorandum, the 1995 and 1996 Memoranda are plainly consistent with the Secondary Payer Statute and its cost-shifting purpose. As indicated above, the 1995 and 1996 Memoranda state that, after the "promptly" period has passed,

378

a provider may either bill Medicare for conditional payment or continue to pursue a "liability insurance settlement" including by means of a lien. The 1995 and 1996 Memoranda do not impose any cut-off date on provider liens and therefore do not diminish the incentives a provider might have to continue to pursue its lien instead of billing Medicare.

¶ 52. Laska points out that the 2000 Memorandum relies not only on the Provider Agreement Statute but also on its legislative history, which shows that one of the purposes of the statute is "to protect Medicare beneficiaries in all [Secondary Payer] liability situations." As indicated above, case law reflects a similar purpose. *See Rybicki*, 792 F.2d at 262 (purpose of provision at issue is "protecting the [beneficiary]'s pocketbook"); *McMahon*, 476 F. Supp. at 981 (one purpose is "to ensure that beneficiaries receive proper . . . financial treatment").

¶ 53. We acknowledge that the 2000 Memorandum is at least arguably consistent with those purposes insofar as adhering to it might, in some cases, help ensure that a patient's tort recovery is not diminished. However, that alone is insufficient to overcome all of the reasons discussed above for concluding that the 2000 Memorandum lacks a reasonable basis to support its interpretation of the law.

¶ 54. On this topic, we note a gap in Laska's argument. Specifically, Laska does not explain how the bottom line for him would be different if the Hospital had billed Medicare instead of pursuing its lien. That is, Laska does not explain why Medicare could or would not have, in that instance, pursued reimbursement from Laska's tort claims in lieu of the Hospital. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (Medicare entitled to recover conditional payments from primary payer if it is shown

that the primary payer has responsibility for payment).[9] For all of these reasons, we are not persuaded by the reliance that the 2000 Memorandum and Laska place on the purpose of the Provider Agreement Statute.

¶ 55. In sum, we conclude that neither the 2000 Memorandum nor Laska provides sufficient reason to conclude that the 2000 Memorandum is a reasonable interpretation of federal law. Laska fails to point to any other federal authority that would bar the Hospital's lien after the Medicare billing period expired. Therefore, we reject Laska's argument that the circuit court erred in its interpretation of federal law.

*2. Whether Dorr Bars Enforcement of the Lien*

¶ 56. We turn to Laska's argument that *Dorr* bars the Hospital's lien. As indicated above, the parties submitted supplemental briefing on whether the supreme court's recent decision in *Gister* affects Laska's *Dorr*-based argument.

¶ 57. Laska argues in his supplemental briefing that *Gister* "has no bearing on the outcome of this case" and "changes nothing" about our analysis. We explain below why we disagree and why Laska fails to persuade us that *Dorr* bars the Hospital's lien, given that *Gister* limited *Dorr* to its facts. We first summarize *Dorr*, then turn to *Gister* and explain why it defeats Laska's *Dorr*-based argument.

*a. Dorr*

¶ 58. As in Laska's case, this court's *Dorr* opinion involved a hospital lien under Wis. Stat. § 779.80 against a patient's tort claim. *See Dorr*, 228 Wis. 2d at

---

[9] As indicated above, Laska does not develop any argument regarding the made-whole doctrine, and therefore we do not address the topic.

432–33. In *Dorr*, however, the patient had medical coverage through a private health maintenance organization (HMO). *See id.* at 430–33. Based on a contracted "per diem rate" flat fee arrangement that the hospital used to charge the HMO for treatment of HMO subscribers, the Hospital recovered less than it would have recovered if it had billed on an "itemized cost basis." *Id.* at 430, 432–33. The hospital filed the lien against the patient's tort claim in an apparent attempt to recover the difference between the per diem rate the HMO agreed to reimburse and the price based on an itemized cost basis. *See id.* at 430, 433.

¶ 59. In addressing whether the hospital could maintain its lien, we first noted that, "[b]ecause a lien is a right to encumber property until a debt is paid, it presupposes the existence of a debt" of an obligor to a lienholder. *Id.* at 437–38. We next determined that, under the hospital lien statute, Wis. Stat. § 779.80, the obligor who owes the underlying debt must be a patient who received the hospital's services. *Id.* at 438–39. We further determined that the patient in *Dorr* owed no debt to the hospital. *Id.* at 433, 444. This is because the HMO, and not the patient, was obligated to pay for the patient's medical services, under both (1) a state statute immunizing HMO enrollees from personal liability for the costs of covered health care received and (2) an agreement between the patient's HMO and hospital. *Id.* Therefore, we concluded that the hospital could not impose a lien under § 779.80 against the patient's tort claim. *Id.* at 431, 444.[10]

---

[10] The "immunity" state statute in *Dorr v. Sacred Heart Hospital*, 228 Wis. 2d 425, 597 N.W.2d 462 (Ct. App. 1999), Wis. Stat. § 609.91, provides, in part, as follows:

(1) Immunity of enrollees and policyholders. Except as provided in sub. (1m) or (1p), an enrollee or policyholder of a health

### b. *Gister and Laska's Argument*

¶ 60. The patients in *Gister* were not HMO patients but instead were eligible for *Medicaid* (not Medicare). *Gister*, 342 Wis. 2d 496, ¶¶ 2–4. The hospital in *Gister* pursued liens instead of billing Medicaid for three such patients with tort claims. *See id.*, ¶¶ 2–4 & n.2. The *Gister* court concluded that the liens were permissible. *Id.*, ¶ 2.

¶ 61. We need not summarize *Gister* in great detail for our purposes here. It is enough to focus on two aspects of *Gister*.

¶ 62. First, the court in *Gister* expressly "limit[ed] *Dorr* to its facts and expressly reject[ed] any interpretation of the [*Dorr*] decision that finds in it broadly applicable principles of law regarding hospital liens." *Id.*, ¶ 39. The court explained that "*Dorr* is legally and factually distinguishable . . . because it involved patients protected by contractual and statutory immunity as the result of an HMO." *Id.*

¶ 63. Second, *Gister* contains the following directive: "When a court is presented with a challenge to a hospital lien against a settlement between a patient and a third-party tortfeasor and their insurer, it should

maintenance organization insurer is not liable for health care costs that are incurred on or after January 1, 1990, and that are covered under a policy or certificate . . . .

. . . .

(2) Prohibited recovery attempts. No person may bill, charge, collect a deposit from, seek remuneration or compensation from, file or threaten to file with a credit reporting agency or have any recourse against an enrollee, policyholder or insured, or any person acting on their behalf, for health care costs for which the enrollee, policyholder or insured, or person acting on their behalf, is not liable under sub. (1), (1m), or (1p).

ask whether the applicable statutory and regulatory framework permit the lien in light of the specific facts of the case." *Id.*, ¶ 60.

¶ 64. Laska fails to recognize that *Gister* limited *Dorr* to its facts. Instead, as indicated above, Laska argues that *Gister* has no bearing on the outcome of his case and changes nothing about our analysis. This argument lacks merit because *Gister* limits *Dorr* to the HMO context. It may be true that, after *Gister*, non-HMO patients remain free to argue that there is some statute or contract that makes them directly analogous to the patient in *Dorr*. However, Laska has not developed such an argument here. If Laska means to argue that the Provider Agreement Statute or the Department's 2000 Memorandum interpreting that statute makes his situation directly analogous to *Dorr*, we reject that argument based on our analysis of federal Medicare law above.

¶ 65. Laska also fails to acknowledge or discuss *Gister*'s directive that courts should "ask whether the applicable statutory and regulatory framework permit the lien in light of the specific facts of the case." *See id.*, ¶ 60. As far as we can discern, we have followed this directive by conducting our analysis of federal Medicare law. Laska does not develop any argument that there is any other federal authority, or any state authority apart from *Dorr*, that would bar the Hospital's lien.

¶ 66. For all of the reasons stated, we reject Laska's argument that *Dorr* bars enforcement of the Hospital's lien.

## CONCLUSION

¶ 67. In sum, we reject Laska's arguments that the circuit court erred in interpreting federal Medicare law to allow the Hospital to enforce its lien and that

*Dorr* bars enforcement of the lien. We therefore affirm the court's judgment allowing the Hospital to enforce the lien.

*By the Court.*—Judgment affirmed.